Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: 208.342.5000
EFStidham@hollandhart.com
JMAiko@hollandhart.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN LIVESTOCK JOURNAL, LLC, an Oklahoma limited liability company and SUPERIOR LIVESTOCK AUCTION, LLC an Oklahoma limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> LOGAN M. IPSEN, an individual and STOCK POINT MEDIA GROUP, LLC, an Idaho limited liability company, <br><br> Defendants. | Case No. <br><br> **VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

Plaintiffs Western Livestock Journal, LLC ("WLJ") and Superior Livestock Auction, LLC ("Superior") bring this Verified Complaint against Defendants Logan M. Ipsen ("Ipsen") and Stock Point Media Group, LLC ("Stock Point") (collectively, "Defendants") and allege as follows:

## II.    NATURE OF THE ACTION

1.    This case arises from Defendant Ipsen's calculated scheme to misappropriate trade secrets and confidential business information from his employer, WLJ, in order to launch a directly

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 1

competing business (Stock Point Media Group, LLC) while still serving as WLJ's President and Manager and while still receiving his salary from WLJ.

2. While employed by WLJ and entrusted with the company's most sensitive strategic plans, subscriber data, and proprietary business initiatives, Ipsen secretly formed Stock Point, registered a competing domain on the very same day he learned the details of WLJ's confidential Strategic Plan, exported confidential subscriber and email lists, solicited WLJ's sales staff to join his competing venture, and launched a competing website that replicates WLJ's confidential Strategic Plan, all before tendering his resignation.

3. In addition, while still employed as WLJ's President and receiving his WLJ salary, Ipsen operated an undisclosed competing "ring service" side business, personally soliciting WLJ's advertising customers to pay him directly in cash for ring services and using WLJ's corporate credit card to fund travel for these personally compensated engagements, in direct competition with WLJ's own ring service offerings.

4. Ipsen's misconduct constitutes trade secret misappropriation, breach of fiduciary duty, constructive fraud, unfair competition, conversion of WLJ's proprietary information, and unjust enrichment. Plaintiffs seek injunctive relief, damages, and all other relief to which they are entitled.

### III.    PARTIES

5. Plaintiff Western Livestock Journal, LLC is an Oklahoma limited liability company, registered to do business in Idaho, and a wholly owned subsidiary of Superior. WLJ is a 100-year-old legacy brand livestock industry publication serving seedstock producers, auction markets, ranchers, and agricultural businesses across the western United States. Its offerings include news coverage of the western livestock industry, market reports, sale calendars (bull sales,

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 2

production sales), and advertising services to a targeted audience in the livestock sector. Advertising services typically include "ring service," providing in-person auction calling at the advertised sale.

6.      Plaintiff Superior Livestock Auction, LLC is an Oklahoma limited liability company. Superior is the parent company of WLJ, its sole member, and oversees WLJ's operations through its executive management team.

7.      Defendant Logan M. Ipsen is an individual who, upon information and belief, resides at 4550 Elgin Road, New Plymouth, Idaho 83655. Ipsen served as President and Manager of WLJ from 2022 until his resignation on June 29, 2026.

8.      Defendant Stock Point Media Group, LLC is an Idaho limited liability company formed on March 6, 2026, with the Idaho Secretary of State (File No. 0006700701). Its Certificate of Organization lists Stevie A. Ipsen as registered agent and designates the principal office at 4550 Elgin Road, New Plymouth, Idaho 83655. Logan M. Ipsen and Stevie A. Ipsen are listed as governors of Stock Point.

## IV.   JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1836(b) (the Defend Trade Secrets Act) and 28 U.S.C. § 1331 (federal question jurisdiction). This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

10.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiffs WLJ and Superior are Oklahoma limited liability companies with their principal places of business in Oklahoma. Upon information and belief, WLJ's members and Superior's members are citizens of

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 3

Oklahoma. Defendant Ipsen is a citizen of Idaho. Defendant Stock Point is an Idaho limited liability company with its principal place of business in Idaho, and upon information and belief, Stock Point's members, Logan M. Ipsen and Stevie A. Ipsen, are citizens of Idaho.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Ipsen resides in this District, Defendant Stock Point is organized under Idaho law with its principal office in this District, and a substantial part of the events giving rise to this action occurred in this District.

12.    This Court has personal jurisdiction over Defendants because Defendant Ipsen resides in Idaho, Defendant Stock Point is an Idaho limited liability company with its principal office in Idaho, and Defendants have conducted and continue to conduct business in Idaho related to the claims asserted herein.

## V.    FACTUAL ALLEGATIONS

### A.    WLJ's Organization and Ipsen's Employment

13.    WLJ was organized for the purchase of the Western Livestock Journal and the management of its business on December 21, 2021, under the laws of Oklahoma. WLJ is a wholly owned subsidiary of Superior. WLJ publishes the Western Livestock Journal, a livestock industry publication serving seedstock producers, auction markets, ranchers, and western agricultural businesses across the western United States.

14.    In 2022, WLJ hired Ipsen to serve as President of the company. As President, Ipsen was responsible for supervising WLJ's day-to-day operations, developing and improving company strategy, monitoring gross and net margins, and reviewing and approving budgets. Ipsen was the most senior executive at WLJ with day-to-day management authority over the publication's

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 4

operations. Ipsen was paid handsomely for this role, receiving a substantial salary to oversee WLJ's finances, operations, and strategy.

15. On or about July 21, 2022, Ipsen acknowledged in writing WLJ's employee handbook. The acknowledgment form lists Ipsen's position as "PRESIDENT." Among other things, the employee handbook imposes strict non-disclosure obligations on employees with respect to customer information and business operation information.

16. On May 15, 2026, at the annual meeting of WLJ's board of directors held at the Embassy Suites Hotel in Oklahoma City, Oklahoma, Ipsen was reconfirmed as a "Manager" of WLJ in addition to serving in the role of President. From 2022 until his resignation on June 29, 2026, Ipsen held himself out as President and concealed that he was violating the fiduciary duties and duties of loyalty that he owed to WLJ.

**B. WLJ's Trade Secrets and Confidential Information**

17. WLJ maintains a compilation of confidential information on its print subscribers within a secured SimpleCirc account (the "Subscriber List"). The Subscriber List contains the names and mailing addresses of all past and present print subscribers. For some subscribers, the Subscriber List also includes phone numbers, email addresses, notes about key contacts, methods of mailing, subscription initiation and renewal dates, and other significant information. The Subscriber List took years of work and expertise to generate and represents years of effort by WLJ to develop relationships with readers, advertisers, and industry participants in the western livestock sector.

18. The Subscriber List is subject to reasonable secrecy measures. WLJ specifically keeps the individualized subscriber information solely within the SimpleCirc platform to maintain its confidentiality. Access to SimpleCirc requires a unique username and password. Only three

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 5

WLJ employees have login credentials to SimpleCirc: Hannah Jackson (Circulation Manager), Anna Miller Fortozo (Managing Editor), and Kirby Brincefield (Senior Operations Manager). While employed with WLJ, Ipsen also had his own SimpleCirc username and password. His credentials were deactivated immediately after his resignation.

19.    WLJ also maintains within Constant Contact a database of recipients of email newsletters and other email updates (the "Email List"). The Email List contains subscriber email addresses and corresponding information about which email newsletters and e-blasts each subscriber has opted to receive, including categories such as Livestock Sales, Ranch & Farm Properties, Feed-Nutrition-Animal Health, and Equipment. As of June 16, 2026, the Email List contained 11,719 contacts.

20.    The Email List is secured with username, password, and two-factor authentication. Only Mike Oldcorn (Graphic Designer and Ad Coordinator) and Kirby Brincefield have any regular business need to access Constant Contact. Ipsen was not given access to Constant Contact because he was not involved in the sending of email newsletters or updates.

21.    The Subscriber List and Email List are not publicly available and could not be readily assembled from public sources. The contacts on the lists include seedstock producers, auction markets, ranchers, and western agricultural businesses who have subscribed to WLJ's publications. Each name and corresponding notation exists because an individual invested time promoting WLJ, building rapport with the client, and learning about the client's needs and business.

22.    The Subscriber List and Email List derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons who could obtain economic value from their disclosure or use. A competitor could use the

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 6

Subscriber List or Email List to reach out to individuals the competitor otherwise would not know how to contact, to disrupt WLJ's client relationships, and to cut WLJ out of sales and opportunities without ever having invested in the resources it took to build these lists. The customer lists were an element of the intangible property obtained in the 2021 purchase of WLJ, valued at six figures.

23.    Additionally, a competitor's unfair advantage from the lists erodes the subscriber base for WLJ's salespeople's sale of advertising, lowering the value of such advertisements. WLJ's salespeople are paid entirely on commission. Loss of customers from unfair competition directly impacts WLJ's ability to retain its sales talent, creating an imminent risk of a downward spiral. Salespeople are particularly difficult to find because of the specialized experience required for success in advertising, the cattle industry, and auction. Loss of even one salesperson could be catastrophic to WLJ's annual revenue.

**C.    WLJ's Confidential Strategic Plan**

24.    During his tenure as President of WLJ, Ipsen did nothing to innovate the business, managed staff poorly, and disregarded fundamental financial principles. Ipsen repeatedly failed to meet financial expectations, showed no signs of improving the business, and failed to communicate a viable plan for improvement to Superior's executives. Every time Superior's executives met with Ipsen, his core objective appeared to be to buy time for an additional year or two. Given Ipsen's failings, in 2026, Superior determined that it needed to intervene to address the business challenges facing WLJ.

25.    Superior invested months of its executives' time and expertise developing a confidential Strategic Plan for WLJ. The Strategic Plan was the result of months of financial and performance analysis by C-suite-level management, analyzing cost structures and areas with compressed gross margins, and evaluating consumer preferences and trends. The Strategic Plan

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 7

represented a new, highly efficient business model for WLJ that not only addressed costs but significantly innovated how the company would use technology and pursue revenue. To protect its confidentiality, the Strategic Plan was shared only with a few individuals in executive management and Dare Lovett, on a need-to-know basis. The Strategic Plan was shared with Ipsen so that he could implement it as President and Manager of WLJ.

26.     On April 19, 2026, WLJ held a confidential, in-person strategy meeting in Oklahoma City, in the office of Danny Jones (Superior's President). The meeting attendees were Ipsen, Danny Jones, Mason Groves (Chief Operating Officer of Superior's parent company, National Livestock), and Sam Hughes (Chief Operating Officer of Superior). This was a closed-door meeting because the attendees were discussing confidential strategic planning for WLJ.

27.     During the April 19, 2026 strategy meeting, Superior shared the confidential Strategic Plan with Ipsen and directed him to implement it at WLJ. The attendees discussed WLJ's financials and confidential action items expected to improve the company's position, including: (1) a reduced-frequency print publication model (publishing 11 times per year rather than monthly); (2) discontinuing WLJ's rental of its own office space; and (3) certain workforce reductions (the "Action Items").

28.     Directly after the April 19, 2026 strategy meeting, at Hughes's directive, Ipsen met with Dare Lovett, Superior's Business Development Manager, for approximately one hour in a conference room. Hughes asked Lovett to show Ipsen the "Seed Stocked" platform and explain how it would build on the WLJ brand and increase WLJ revenue.

29.     Seed Stocked is a proprietary platform developed by Dare Lovett over months of dedicated research and development. It is the first (and to Plaintiffs' knowledge, only) database or directory intended to include all known seedstock producers, a universal seedstock producer

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 8

directory. To maximize engagement, Lovett's team contacted seedstock producers, sending unique links through which they could upload information and claim their accounts. Building out the software and engaging with producers took months of dedicated time and effort.

30.    During the April 19 meeting with Lovett, Ipsen was shown the front-facing Seed Stocked website. Ipsen had his MacBook with him, accessed the Seed Stocked website, and bookmarked it. Lovett also showed Ipsen the back-end features accessible only to an admin or super admin, demonstrating how to add new accounts, advertisers, ringmen, and other service providers. Additionally, Lovett presented Ipsen with a news aggregation model similar to "Morning Brew" and certain proprietary map features and digital tools. Lovett also discussed digital marketing integration strategies for advertisers.

31.    This meeting between Ipsen and Lovett was confidential. Lovett understood the information to be confidential. Prior to sharing it with Ipsen, Lovett had not shared this information with anyone except Sam Hughes. At the time of this meeting, the Seed Stocked platform was still being built out.

32.    The strategic planning initiatives discussed with Ipsen on April 19, 2026, including the Seed Stocked business plan, digital marketing integration strategy for advertisers, news aggregation model, proprietary map features and digital tools, together with the Action Items, constituted WLJ's confidential Strategic Plan (the "Strategic Plan").

33.    In the hands of a competitor, the Strategic Plan provides an unfair advantage— giving the competitor an automatic leg up on assembling a higher-efficiency business model without investing the time, expertise, and access to proprietary customer data that went into developing it. Sharing the Strategic Plan with a competitor would be catastrophic to WLJ.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 9

**D.      Ipsen's Formation of Stock Point and Misappropriation of Confidential Information**

34.      On March 6, 2026, while still serving as President and Manager of WLJ and while still receiving his salary, Ipsen secretly formed Stock Point Media Group, LLC under the laws of Idaho. Ipsen formed Stock Point with the knowing assistance of his wife, Stevie A. Ipsen. The Certificate of Organization (File No. 0006700701) lists Stevie A. Ipsen as registered agent, with the principal office at the Ipsens' residence at 4550 Elgin Road, New Plymouth, Idaho 83655. Logan M. Ipsen and Stevie A. Ipsen are listed as governors.

35.      Ipsen formed Stock Point without WLJ's knowledge or consent. At the time of Stock Point's formation, Ipsen was, and continued to be, a fiduciary of WLJ, owing duties of loyalty, care, and good faith to the company.

36.      On the evening of April 19, 2026, the same day as the confidential strategy meeting and Ipsen's confidential meeting with Dare Lovett, the domain "stockpointmedia.com" was registered through Squarespace Domains LLC at approximately 7:17 p.m. Central Time (00:17:22 UTC on April 20, 2026). ICANN records confirm the domain was registered later in the day on April 19, 2026, after Ipsen had met with Lovett and learned the details of the Seed Stocked platform and other proprietary strategic initiatives. Within minutes of registration, nameservers were pointed to Google Cloud DNS/Firebase, indicating immediate technical infrastructure buildout for the competing website.

37.      The timing of the domain registration—on the very same day Ipsen learned the details of WLJ's confidential Strategic Plan—demonstrates that Ipsen immediately began building a competing business using WLJ's proprietary information.

38.      But instead of implementing the Strategic Plan to benefit WLJ, Ipsen resisted and criticized it. After the April 19, 2026 strategy meeting, Hughes continued to meet and

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 10

communicate with Ipsen regarding implementation of the Strategic Plan. However, Ipsen completed only one task to further the Strategic Plan: providing Hughes with a list of employees and duties to evaluate operational efficiencies. Ipsen was also required to terminate Jared Patterson's sales contract but failed to do so. Instead, as set forth below, Ipsen shared with Patterson that his contract would be terminated and attempted to recruit Patterson to join Stock Point. Otherwise, Ipsen made no progress toward implementing the Strategic Plan and took no action indicating he intended to ever implement it.

39.　On May 23, 2026, thirty-seven days before his resignation, the first market report was published on stockpointmedia.com (the "Stock Point Website"), demonstrating that Ipsen was actively building Stock Point's competing content while still employed by and serving as a fiduciary of WLJ.

40.　On June 3, 2026, Ipsen exported data from WLJ's SimpleCirc account at least six times. There was no reasonable WLJ business purpose for obtaining bulk exports of subscriber data from a system specifically designed to maintain confidentiality by keeping such information within the platform.

41.　On June 11, 2026, eighteen days before his resignation, the first calendar/event listing (Donati Ranch) was added to the Stock Point Website.

42.　On June 16, 2026, thirteen days before his resignation, Ipsen sent a text message to Mike Oldcorn, WLJ's Graphic Designer and Ad Coordinator, requesting that Oldcorn provide him with WLJ's complete Email List. Ipsen described the request as being for a "data clean up," a pretextual and fraudulent justification. Ipsen had never previously requested this information from Oldcorn. Oldcorn understood Ipsen to be the most senior executive at WLJ with day-to-day management authority and had no reason to question Ipsen's authority or reasons for making the

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 11

request. Oldcorn was not aware, at that time, that Ipsen had formed a competing company or that he intended to resign from WLJ.

43. Later on June 16, 2026, Oldcorn exported the names and email addresses from Constant Contact to an Excel file and emailed the file to Ipsen. Upon further text communication from Ipsen, Oldcorn exported the data again, this time including the respective types of email newsletters and updates each subscriber had signed up for, and emailed the second file to Ipsen.

44. Ipsen's request for and acquisition of the Email List came only thirteen days before his resignation and served no legitimate WLJ business purpose. Ipsen obtained the Email List under false pretenses, exploiting his position of authority to acquire confidential information he intended to use for his competing venture. Notably, Ipsen was not authorized to access Constant Contact himself and had to direct a subordinate to export the data for him.

45. On June 17, 2026, the second market report was published on the Stock Point Website.

46. Also on June 17, 2026, Ipsen participated in a telephone call with Kirby Brincefield and Anna Miller Fortozo lasting approximately one hour. During the call, Ipsen communicated his frustration with the turnaround plans Superior was requiring him to implement. He told them that Superior had a "personal vendetta" against him, which he said was the reason for the operational changes.

47. During this same call, Ipsen revealed that he was developing a competing venture and intended to take WLJ's sales staff with him. Specifically, Ipsen stated: "I don't have any intention of just bailing. But I'm not afraid to go start my own thing when I'm out. And that's where I stand. I have a pretty neat project . . . in the works, just in case. But I just feel like I've got to give this my best effort . . . trying to navigate this and figure it out, or figure out where I can

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 12

keep the salespeople together under a different name." When Brincefield confronted him about his "Plan B," Ipsen responded that he was not "just trying to leave and you guys pick up the pieces. It's me leaving so that the pieces stay together."

48.    During the June 17, 2026 call, Ipsen also indicated that he had shared with Jared Patterson the content of confidential communications about the planned reassignment of Patterson's sales accounts, information Ipsen obtained during the confidential April 19, 2026 strategy meeting. By disclosing this confidential information to Patterson, Ipsen breached his fiduciary duties to WLJ and improperly used confidential information for purposes adverse to WLJ's interests.

49.    On June 25, 2026, an additional calendar listing was added to the Stock Point Website.

50.    On June 26, 2026, three days before resigning from WLJ, Ipsen met via Zoom with the three WLJ salesmen and solicited them to join his competing venture, Stock Point. Ipsen sent the Zoom meeting invitation from his WLJ email account (logan@wlj.net) to the three salesmen. This solicitation occurred while Ipsen remained employed by, received his salary from, and owed fiduciary duties to WLJ.

51.    Brincefield discovered the June 26, 2026 Zoom meeting after Ipsen resigned by downloading email records from the logan@wlj.net account.

52.    Also on June 26, 2026, stockpointmedia.com published ten news articles within a two-hour window (between approximately 9:45 a.m. and 11:49 a.m. Central Time), constituting Stock Point's coordinated "hard launch." The same day, the Stock Point Media Facebook page was created, with its first post published at approximately 3:00 p.m.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 13

53.    On June 27, 2026, an additional calendar listing and Stock Point's first sales report were published on stockpointmedia.com.

**E.    Ipsen's Resignation and Continued Misappropriation**

54.    On June 29, 2026, at 11:35 a.m. Central Time, Ipsen abruptly resigned from WLJ. WLJ had not expected Ipsen to leave at that time, immediately after the company had completed months of closed-door strategic planning and was at the vulnerable point of implementing it. Ipsen had secretly formed and built out Stock Point's operations over a period of more than two months before Ipsen's abrupt resignation.

55.    Within 46 to 71 minutes of Ipsen's resignation (between 12:21 p.m. and 12:46 p.m.), the Stock Point Website published four more news articles. Over the following two days (June 30 and July 1, 2026), the website published six additional articles and has generally continued publishing on a daily basis since.

56.    The rapid publication of content immediately following Ipsen's resignation demonstrates that Stock Point's operations were fully built out while Ipsen was still employed by WLJ and that the content was prepared in advance using time, resources, and information Ipsen should have been devoting to WLJ.

57.    On July 6, 2026, Plaintiffs' counsel (Nathan L. Whatley of McAfee & Taft) sent a cease and desist letter to Ipsen demanding, among other things, that he return all confidential information belonging to WLJ.

58.    Upon information and belief, Ipsen has wrongfully retained the Subscriber List and Email List after his tenure with WLJ ended and has used or intends to use such information for the benefit of Stock Point, to WLJ's detriment.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 14

**F.       The Stock Point Website Replicates WLJ's Confidential Strategic Plan**

59.       Examination of the Stock Point Website reveals that it is built upon WLJ's confidential Strategic Plan. The Stock Point Website incorporates the following elements of the Strategic Plan that were shared with Ipsen in confidence on April 19, 2026:

60.       First, the Stock Point Website is built around the unique Seed Stocked concept of a universal seedstock producer directory. This is demonstrated by the variety in the sales listed (breeds, types, and platforms) and by the structure of the sale listings, which feature sales and include links for the seller to claim the sale and add information, replicating the Seed Stocked approach that Lovett demonstrated to Ipsen.

61.       Second, the Stock Point Website mimics the Seed Stocked user experience ("UX") design in nearly all its calendar and search features. A comparison of the Stock Point Website's calendar interface with the Seed Stocked platform reveals substantial UX similarities.

62.       Third, the Stock Point Website attempts to imitate the proprietary, interactive map feature from the Seed Stocked platform. The Stock Point Website includes a "Map" button that displays an interactive map feature materially similar to the proprietary map Lovett developed and showed to Ipsen on April 19, 2026.

63.       Fourth, the Stock Point Website states that Stock Point Magazine is "published 11 times annually by Stock Point Media Group," the same reduced-frequency print model (11 issues per year) discussed in the confidential Strategic Plan. The Stock Point Website also advertises "21,000 READERS," "33,500 SOCIAL MEDIA FOOTPRINT," and "50,000 POTENTIAL DIGITAL FOOTPRINT."

64.    Fifth, the Stock Point Website incorporates a news aggregation model (attributed to "Yahoo! News") substantially similar to the "Morning Brew" news aggregation model that was part of the Strategic Plan presented to Ipsen by Dare Lovett.

65.    The proprietary plans incorporated into the Stock Point Website represent months of work and analysis by Superior's executive team and Dare Lovett, intended solely to benefit WLJ. These plans were shared with Ipsen only in his capacity as President and Manager of WLJ, with the expectation that he would use the information for WLJ's benefit, not to compete against it. Ipsen exploited his insider access and used WLJ's own confidential strategy against it for his personal gain.

66.    Defendants' timeline demonstrates misappropriation. Ipsen formed Stock Point but did not resign from WLJ until after he had gained the confidential information and competitive advantage he could use for Stock Point. He waited for WLJ to complete its round of strategic planning, identified action items capable of imitation by a competitor, withheld approvals for WLJ's actions in implementing the Strategic Plan to delay WLJ's ability to strengthen its financial position, wrongfully retained the Subscriber List and Email List, and launched a competing website using WLJ's proprietary information while still employed by WLJ.

## G.    Ipsen's Undisclosed Competing Ring Service Business

67.    In addition to the misappropriation of trade secrets and confidential information described above, Ipsen operated an undisclosed competing ring service side business for approximately six to twelve months before his resignation from WLJ.

68.    WLJ's salespeople normally perform ring service (in-person auction calling) as part of a 35% commissioned advertising package offered to WLJ's customers. Ring service is thus a

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 16

core component of WLJ's advertising business and a significant source of revenue for its salespeople.

69.     Ipsen personally solicited WLJ's advertising customers to pay him directly, in cash, for ring service—thereby competing directly with WLJ's own ring service offerings and diverting business opportunities that belonged to WLJ.

70.     Ipsen used WLJ's corporate credit card to fund travel expenses for engagements at which he was being personally compensated in cash for ring service. This constituted unauthorized personal use of WLJ's corporate resources for a competing side business.

71.     When WLJ staff confronted Ipsen about his ring service side business, he responded defensively and did not disclose the full scope of his activities or cease competing with WLJ.

72.     Ipsen's operation of a competing ring service business while serving as WLJ's President and Manager, without disclosure to or authorization from WLJ or Superior, constituted a breach of his fiduciary duties of loyalty and good faith, as well as self-dealing and usurpation of corporate opportunities.

## CLAIMS FOR RELIEF

### COUNT ONE
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act
### (18 U.S.C. § 1836 et seq.)
### (Against All Defendants)

73.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

74.     WLJ's Subscriber List, Email List, and Strategic Plan constitute "trade secrets" as defined by 18 U.S.C. § 1839(3). Each is information, including compilations, that: (a) the owner thereof has taken reasonable measures to keep secret; and (b) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 17

proper means by, another person who can obtain economic value from the disclosure or use of the information.

75.     Plaintiffs took reasonable measures to maintain the secrecy of their trade secrets, including: limiting access to the SimpleCirc account to only three employees with unique credentials; securing the Constant Contact account with username, password, and two-factor authentication; keeping the Strategic Plan confidential and sharing it only on a need-to-know basis with executive management and key personnel; and imposing confidentiality obligations on employees through WLJ's employee handbook.

76.     Defendants misappropriated Plaintiffs' trade secrets within the meaning of 18 U.S.C. § 1839(5). Ipsen acquired the Subscriber List, Email List, and Strategic Plan through improper means, including breach of his duty to maintain their secrecy and through deception, exploiting his position of authority to obtain confidential data he intended to use for a competing venture. Ipsen made fraudulent statements to WLJ employees to misappropriate WLJ's closely guarded subscriber list and other proprietary information. Ipsen disclosed and used Plaintiffs' trade secrets without consent for the benefit of Stock Point.

77.     Defendants' misappropriation was willful and malicious. Ipsen formed Stock Point while still employed as WLJ's President and Manager, secretly built a competing business using WLJ's proprietary information, and continued to misappropriate trade secrets after his resignation.

78.     The trade secrets at issue are related to products or services used in, or intended for use in, interstate commerce, satisfying the jurisdictional requirement of the Defend Trade Secrets Act.

79.     As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer irreparable harm and damages in an amount to be proven at

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 18

trial, including but not limited to actual losses caused by the misappropriation, unjust enrichment, and loss of goodwill and customer relationships.

80.     Plaintiffs are entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A), damages, exemplary damages of up to two times the amount of damages for willful and malicious misappropriation, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(B)–(D).

**COUNT TWO**
**Misappropriation of Trade Secrets Under the Oklahoma Uniform Trade Secrets Act**
**(78 Okla. Stat. §§ 85 to 94)**
**With Idaho Uniform Trade Secrets Act Pled in the Alternative**
**(Idaho Code § 48-801 et seq.)**
**(Against All Defendants)**

81.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82.     WLJ's Subscriber List, Email List, and Strategic Plan constitute "trade secrets" as defined by 78 Okla. Stat. § 86(4) and, in the alternative, Idaho Code § 48-801(5). Each derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

83.     Defendants misappropriated Plaintiffs' trade secrets within the meaning of 78 Okla. Stat. § 86(2) and, in the alternative, Idaho Code § 48-801(2). Ipsen acquired the trade secrets by improper means, including breach of his duty to maintain secrecy and through deception, and disclosed and used the trade secrets without Plaintiffs' express or implied consent.

84.     As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and will continue to suffer irreparable harm and damages. Plaintiffs are entitled to

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 19

injunctive relief, damages, exemplary damages for willful and malicious misappropriation, and reasonable attorneys' fees pursuant to the Oklahoma Uniform Trade Secrets Act and/or the Idaho Uniform Trade Secrets Act.

## COUNT THREE
### Misappropriation of Confidential Business Information
### (Against All Defendants)

85.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

86.     In the alternative, to the extent any of the information described herein is determined not to constitute a "trade secret" under federal or state law, such information nonetheless constitutes confidential business information belonging to Plaintiffs that was wrongfully acquired, disclosed, and used by Defendants.

87.     Ipsen acquired Plaintiffs' confidential business information while in a position of trust and confidence and subject to express and implied duties of confidentiality. Ipsen's acquisition, use, and disclosure of such information for purposes adverse to Plaintiffs' interests was wrongful and unjustified.

88.     As a direct and proximate result, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT FOUR
### Breach of Fiduciary Duty (Duty of Loyalty) Under the Oklahoma Revised Uniform Limited Liability Company Act (18 Okla. Stat. § 2016)
### (Against Defendant Ipsen)

89.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

90.     As President and Manager of WLJ, Ipsen owed fiduciary duties to WLJ under Oklahoma law, including the duty of loyalty set forth in 18 Okla. Stat. § 2016. This duty required Ipsen to: (a) account to the company and hold as trustee for it any property, profit, or benefit derived in the conduct or winding up of the company's activities; (b) refrain from dealing with the company on behalf of a person having an interest adverse to the company; and (c) refrain from competing with the company.

91.     Ipsen breached his fiduciary duties by, among other things:

(a)     Secretly forming a competing business, Stock Point, while still serving as WLJ's President and Manager;

(b)     Registering the competing domain "stockpointmedia.com" on the same evening he received WLJ's confidential Strategic Plan;

(c)     Using WLJ's confidential Strategic Plan, including the Seed Stocked concept, news aggregation model, and proprietary map features, to build a competing website;

(d)     Exporting data from WLJ's SimpleCirc account at least six times on June 3, 2026, without a legitimate business purpose;

(e)     Obtaining WLJ's complete Email List of 11,719 contacts on June 16, 2026, under the pretextual guise of a "data clean up";

(f)     Soliciting WLJ's salesmen to join Stock Point via a Zoom meeting on June 26, 2026, while still employed by WLJ;

(g)     Disclosing to Jared Patterson confidential information about the planned reassignment of Patterson's sales accounts;

(h)     Failing to implement the Strategic Plan on behalf of WLJ while secretly using it to benefit his competing venture;

(i)     Publishing competing content on stockpointmedia.com while still employed by and owing fiduciary duties to WLJ;

(j)     Operating an undisclosed competing ring service business, soliciting WLJ customers to pay him directly in cash, and using WLJ's corporate credit card for travel related to those personally compensated engagements.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 21

92. Ipsen's breaches of fiduciary duty were willful, deliberate, and in bad faith. As a direct and proximate result, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, including but not limited to lost profits, lost customer relationships, diminution in the value of trade secrets, and the cost of remediation.

## COUNT FIVE
### Constructive Fraud
### (Against Defendant Ipsen)

93. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

94. Ipsen occupied a position of trust and confidence with respect to WLJ as its President and Manager. By virtue of this relationship, Ipsen owed WLJ duties of utmost good faith, fair dealing, and full disclosure.

95. Ipsen breached these duties by concealing material information: his formation of Stock Point, his misappropriation of WLJ's trade secrets and confidential information, his solicitation of WLJ's salespeople, and his operation of a competing ring service business. Ipsen gained an advantage over WLJ by virtue of these non-disclosures while in a fiduciary position.

96. Plaintiffs did not know, prior to Ipsen's resignation, that he had formed and was building Stock Point and were unaware of his misappropriation of trade secrets and confidential information, his solicitation of WLJ's salespeople, or his operation of a competing ring service business. Had Plaintiffs known, they would not have shared the Subscriber List, Email List, or Strategic Plan with him. And they would not have tolerated his operating the competing ring service business.

97. As a direct and proximate result of Ipsen's constructive fraud, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 22

**COUNT SIX**
**Unfair Competition**
**(Against All Defendants)**

98.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

99.     Defendants have engaged in unfair competition by misappropriating Plaintiffs' trade secrets, confidential information, and proprietary strategic plans to establish and operate a competing business. Defendants' conduct was dishonest, unethical, and contrary to recognized standards of business morality.

100.    Defendants' unfair competitive practices include, but are not limited to: (a) using WLJ's confidential subscriber and email lists to solicit WLJ's customers for Stock Point; (b) replicating WLJ's confidential Strategic Plan in the Stock Point Website; (c) soliciting WLJ's commissioned salespeople to leave WLJ and join Stock Point; (d) disclosing to Jared Patterson confidential information about the planned reassignment of his accounts; and (e) launching a competing publication using WLJ's proprietary information to divert WLJ's audience and advertisers.

101.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

**COUNT SEVEN**
**Unjust Enrichment (Trade Secrets and Strategic Plan)**
**(Against All Defendants)**

102.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

103.    Defendants have been unjustly enriched by their use of Plaintiffs' trade secrets, confidential information, and proprietary Strategic Plan. Defendants obtained the benefit of WLJ's

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 23

Subscriber List, Email List, and Strategic Plan, developed through years of effort and substantial investment, without compensating Plaintiffs and without the investment of time and resources that would otherwise be necessary to develop such assets independently.

104.    It would be inequitable and unjust for Defendants to retain the benefits conferred by Plaintiffs' trade secrets and confidential information. Plaintiffs are entitled to restitution and disgorgement of profits derived from Defendants' unjust enrichment.

**COUNT EIGHT**
**Unjust Enrichment (Ring Services)**
**(Against Defendant Ipsen)**

105.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

106.    Ipsen has been unjustly enriched by his receipt of cash payments from WLJ's advertising customers for ring service that he performed in competition with WLJ, while using WLJ's corporate credit card to fund his travel for those engagements.

107.    Ipsen received these benefits at WLJ's expense, as the ring service opportunities belonged to WLJ and its salespeople. It would be inequitable and unjust for Ipsen to retain these benefits. Plaintiffs are entitled to restitution and disgorgement of all amounts Ipsen received from his unauthorized ring service business.

**VI.    DEMAND FOR JURY TRIAL**

108.    Plaintiffs hereby demand a trial by jury on all issues so triable.

**VII.    REQUEST FOR ATTORNEY FEES**

109.    As the result of the wrongful actions of Defendants, Plaintiffs were required to retain the services of Holland & Hart LLP to pursue this litigation. Plaintiffs are entitled to recover from Defendants their attorneys' fees and costs incurred in prosecuting this lawsuit pursuant to 18

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 24

U.S.C. § 1836(b)(3)(D) (DTSA fee-shifting for willful and malicious misappropriation), the Oklahoma Uniform Trade Secrets Act, 78 Okla. Stat. §§ 85–94, and, in the alternative, Idaho Code § 48-804 (IUTSA fee-shifting), Idaho Rule of Civil Procedure 54, and any other applicable law. If judgment enters by default, a reasonable attorneys' fee in favor of Plaintiffs would be $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

A.       Temporary, preliminary, and permanent injunctive relief enjoining Defendants from using, disclosing, or retaining any of Plaintiffs' trade secrets or confidential information, including the Subscriber List, Email List, and Strategic Plan;

B.       An order requiring Defendants to immediately return to Plaintiffs all copies of the Subscriber List, Email List, and any other confidential information or trade secrets in Defendants' possession, custody, or control, and to certify under oath the completeness of such return;

C.       Compensatory damages in an amount to be proven at trial, including but not limited to damages for lost profits, loss of goodwill, and diminution in the value of Plaintiffs' trade secrets;

D.       Disgorgement and restitution of all profits, benefits, and other amounts earned or received by Defendants through their misappropriation of Plaintiffs' trade secrets and confidential information, and through Ipsen's unauthorized ring service business;

E.       Exemplary damages of up to two times the amount of actual damages for willful and malicious misappropriation pursuant to 18 U.S.C. § 1836(b)(3)(C) and applicable state law;

F.       Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future pursuant to applicable Oklahoma law;

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 25

G.      Reasonable attorneys' fees and costs of suit pursuant to 18 U.S.C. § 1836(b)(3)(D) and applicable state law;

H.      Pre-judgment and post-judgment interest at the highest rate allowed by law;

I.      Such other and further relief as this Court deems just and equitable.

DATED: August 5 2026

HOLLAND & HART LLP


By: */s/Erik F. Stidham*
        Erik F. Stidham
        Jennifer M. Aiko
        *Attorneys for Plaintiffs*

## <u>VERIFICATION</u>

I, Sam Hughes, am the Chief Operating Officer of Superior Livestock Auction, LLC, the parent company of Western Livestock Journal, LLC. I have read the foregoing Verified Complaint and am familiar with the facts stated therein. The factual allegations in the Verified Complaint are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: August 5, 2026

Signed by:

Sam Hughes

49A000AC33A64AC...

Sam Hughes
Chief Operating Officer
Superior Livestock Auction, LLC

38960179_v1

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL - 27