Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: 208.342.5000
EFStidham@hollandhart.com
JMAiko@hollandhart.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN LIVESTOCK JOURNAL, LLC, an Oklahoma limited liability company and SUPERIOR LIVESTOCK AUCTION, LLC an Oklahoma limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>LOGAN M. IPSEN, an individual and STOCK POINT MEDIA GROUP, LLC, an Idaho limited liability company,<br><br>Defendants. | Case No. 1:26-cv-0500-REP<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## I. INTRODUCTION

While employed as President of Western Livestock Journal, LLC ("WLJ"), Logan Ipsen ("Ipsen") stole trade secrets of WLJ and its parent company Superior Livestock Auction, LLC ("Superior"), including confidential and proprietary subscriber data and strategic plans developed by executive management over the course of months to improve WLJ's financial outlook, efficiency, and productivity. Ipsen took and used the trade secrets in violation of his fiduciary and other legal duties to WLJ. While continuing to engage in closed-door meetings to develop and implement the new strategic plan for WLJ, Ipsen secretly organized a competing company, Stock Point Media Group, LLC ("Stock Point"). He covertly exported confidential data on tens of thousands of WLJ's customer contacts and delayed implementing measures intended and anticipated to improve WLJ's position—all while building out Stock Point's operations and launching the business using WLJ's strategic plan and the customer data.

Ipsen's clandestine actions came to light after he resigned on June 29, 2026. WLJ acted promptly, sending Ipsen and Stock Point a cease-and-desist letter on July 6, 2026. Defendants did not respond. Nor did they return Plaintiffs' trade secrets. Stock Point continues to operate its business using the misappropriated plans of WLJ and while in possession of WLJ's confidential subscriber information.

This Court should grant Plaintiffs a temporary restraining order and preliminary injunction. Plaintiffs are likely to succeed on the merits of (at least) their trade secret, misappropriation of business information, and fiduciary duty claims. They have been irreparably harmed by the use of the confidential business plans on behalf of Stock Point and face further imminent irreparable harm from Defendants' continued wrongful use of the plans and apparently intended use of WLJ's subscriber information. The balance of equities tips in Plaintiffs' favor because their injuries are at best difficult to quantify, and Stock Point's new business has only been in operation for five weeks

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 1

and thus would not be unfairly prejudiced by delay while the dispute is resolved. Injunctive relief is in the public interest because it would serve to enforce WLJ's clear legal rights.

## II.    BACKGROUND

### A.    WLJ is a Well-Known Brand Providing Stakeholders With Industry News, Sales Calendars, Market Reports, and Advertising.

The Western Livestock Journal is a 100-year-old legacy brand, a livestock industry publication serving seedstock producers, auction markets, ranchers, and agricultural businesses across the western United States. Hughes Decl., ¶ 3. Its offerings include news coverage of the western livestock industry, market reports, sale calendars (bull sales, production sales), and advertising services to a targeted audience in the livestock sector. *Id.* Advertising typically includes "ring service," providing in-person auction calling at the advertised sale. *Id.*

WLJ was organized for the purchase of the journal and the management of its business on December 21, 2021. *Id.*, ¶ 4. WLJ was formed under the laws of Oklahoma. *Id.* It is a wholly owned subsidiary of Superior. *Id.*

### B.    WLJ Hires Ipsen as President.

In 2022, WLJ hired Ipsen to serve as President of the company. *Id.*, ¶ 5. Ipsen was responsible for supervising WLJ operations, developing and improving company strategy, monitoring gross and net margins, and reviewing and approving budgets. *Id.*

### C.    Ipsen Agrees to the Terms of the Employee Handbook.

On or about July 21, 2022, Ipsen acknowledged in writing WLJ's employee handbook. *Id.*, ¶ 6, Ex. A. Among other things, the employee handbook imposes strict non-disclosure obligations on employees with respect to customer information and business operation information. *See id.*, ¶ 6, Ex. A at 11. The employee handbook also included a duty to return property upon employment termination. *Id.*, ¶ 6, Ex. A at 15.

**D.**      <u>**WLJ Maintains Highly Confidential Databases of Customer Data.**</u>

WLJ maintains within the platform Constant Contact a list of recipients of email newsletters and other email updates (the "Email List"). Brincefield Decl., ¶ 7; Oldcorn Decl., ¶¶ 2-3; Hughes Decl., ¶ 14. This database is secured with a username and password, and two-factor authentication. Brincefield Decl., ¶ 7; Hughes Decl., ¶ 14. Only Mike Oldcorn (WLJ Graphic Designer and Ad Coordinator) and Kirby Brincefield (WLJ Senior Operations Manager) have any regular business need to access Constant Contact. *Id.* Ipsen was not given access because he was not involved in the sending of email newsletters or updates. Brincefield Decl., ¶ 7.

WLJ also maintains a SimpleCirc account, which contains a compilation of confidential information on WLJ's print subscribers ("Subscriber List"). *Id.*, ¶ 5; Hughes Decl., ¶ 13. SimpleCirc includes the names and mailing addresses of all print subscribers, past and present. *Id.* There is additional information on some but not all of those subscribers including phone number, email, notes about key contacts, methods of mailing, when the subscription was initiated, when the subscription was last renewed, and other significant information. *Id.*

As with the Email List, the Subscriber List is subject to secrecy measures. Brincefield Decl., ¶ 6; Hughes Decl., ¶ 13. WLJ specifically keeps the individualized information described above solely within the SimpleCirc software platform to maintain its confidentiality. Brincefield Decl., ¶ 6. An individual may only access SimpleCirc if he or she has a unique login, including username and password. *Id.* Only three WLJ employees presently have login credentials to SimpleCirc, *Id.* Employees with access are limited to only those who need the information— Brincefield, Hannah Jackson (Circulation Manager), and Anna Miller Fortozo (Managing Editor). *Id.* While President, Ipsen had access, which was terminated upon his resignation. *Id.*

The Subscriber List and Email List represent years of effort by WLJ to develop relationships with readers, advertisers, and industry participants in the western livestock sector.

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 3

*Id.*, ¶ 8. The contacts on the lists include seedstock producers, auction markets, ranchers, and western agricultural businesses who have subscribed to WLJ's publications. *Id.* The lists were (and are) not publicly available and could not be readily assembled from public sources. *Id.*

The Subscriber List and Email List form the foundation for the company's ability to generate new business and obtain repeat business from former clients. Hughes Decl., ¶ 15. The customer lists were an element of the intangible property obtained in the purchase of WLJ in 2021, the lists themselves valued at six figures. *Id.* Each name and corresponding note exists because an individual specifically invested time promoting WLJ, building rapport with the client, and learning about the client's needs and business. *Id.*

**E.        WLJ Develops a New Strategic Plan.**

After a few years under Ipsen's management, WLJ's financial position was not as favorable as Superior and WLJ had hoped it would be. *Id.*, ¶ 7. While Ipsen was President, WLJ repeatedly underperformed and showed no signs of improvement. *Id.* Ipsen failed to innovate, manage the company's finances competently, and communicate a plan to improve the company to Superior's executives. Every time the Superior executives met with Ipsen, they felt his core objective was to buy time for an additional year or two. *Id.* In 2026, the Superior executive team determined WLJ needed a new strategic plan to improve its performance. *Id.*

To this end, on April 19, 2026, WLJ held an in-person strategy meeting in Oklahoma City. *Id.*, ¶ 8. Meeting attendees included Ipsen, Danny Jones (Superior President), Sam Hughes (Superior Chief Operating Officer), and Mason Groves (Chief Operating Officer for Superior's parent company). *Id.* This was a closed-door meeting in Danny Jones's office, confidential because the participants were discussing strategic planning. The group discussed WLJ's financials and the confidential action items expected to improve the company's position, including (1) a reduced-frequency print publication model, (2) discontinuing WLJ renting its own space, and (3) certain

workforce reductions (the "Action Items"). *Id.* Ipsen, who had been an independent contractor salesman for WLJ before his role as President, was to assume the book of business of Jared Patterson, whose sales contract would be terminated. This book of business was formerly Ipsen's when he was a salesman. *Id.* While never easy to lay off a worker, WLJ's continuing losses required difficult measures. *Id.* Ipsen's compensation (fully salaried) would shift to a part salary/part commission basis. *Id.* Based on his prior sales record, he would be able to make more total compensation under the new arrangement. *Id.*

Directly after this meeting, at Hughes's direction, Ipsen met with Dare Lovett (Superior's Business Development Manager) to discuss strategic planning initiatives Hughes had developed with Lovett and executive management. *Id.*, ¶ 9. These initiatives included the Seed-Stocked business plan, a digital marketing integration strategy for advertisers, proprietary map features and digital tools, and the path to incorporating the Seed-Stocked strategy under the WLJ umbrella (together with the Action Items, the "Strategic Plan"). *Id.*; Lovett Decl., ¶ 5. Lovett showed Ipsen the Seed-Stocked platform, explained it to him, and showed him how it would build on the WLJ brand and could be used to increase WLJ revenue. Lovett Decl., ¶ 5. Lovett showed Ipsen both the front-facing website, which Ipsen bookmarked on his MacBook. *Id.* Lovett also demonstrated certain back-end features that only an admin or super admin would be able to access. *Id.*

The Strategic Plan was the result of months of financial and performance analysis by C-suite level management. Hughes Decl., ¶ 10. Executive management analyzed cost structures and certain products and areas with compressed gross margins, evaluating consumer preferences and trends. *Id.* They were careful to keep the Strategic Plan confidential. *Id.* To protect its confidentiality, the Strategic Plan was only shared with a few individuals in executive management

and Lovett, on a need-to-know basis. *Id.* The Strategic Plan was only shared with Ipsen so that he could implement it as President or Manager of WLJ. *Id.*

After the April 19, 2026 Oklahoma City strategy meeting, Hughes continued to meet and communicate with Ipsen to implement the Strategic Plan. *Id.*, ¶ 11. Ipsen only completed one task to further the Strategic Plan. *Id.* He was required to (and did) provide Hughes with a list of employees and duties in order to further evaluate operational efficiencies. *Id.* Otherwise, he made no progress toward implementing the Strategic Plan. *Id.* He took no action that would indicate he intended to ever implement it. *Id.*

**F.      Ipsen Obtains an Export of the Entire Email List from Constant Contact.**

On June 16, 2026, Ipsen texted Mike Oldcorn (WLJ Graphic Designer and Ad Coordinator) requesting WLJ's complete email subscriber list (11,719 contacts). Oldcorn Decl., ¶¶ 2-4, Ex. A. Oldcorn understood Ipsen to be the most senior executive at WLJ with day-to-day management authority over the publication's operations. *Id.*, ¶ 5. Ipsen had never requested this information from Oldcorn before. *Id.* But having no reason to question Ipsen's authority or reasons for the request, Oldcorn complied, exporting the Email List and emailing it to Ipsen. *Id.*, ¶¶ 5-6, Ex. B.

**G.      Ipsen Launches a Competing Business and Resigns from WLJ; Investigation Shows He Had Built the Competing Business for Months.**

On June 29, 2026, Ipsen resigned from WLJ. Hughes Decl., ¶ 17. WLJ had not expected Ipsen to leave at that time, right after the company had completed months of closed-door strategic planning and was at the vulnerable point of implementing it. *Id.* Moreover, Ipsen's obtaining the export of the Email List seemed suspicious because Ipsen had apparently not used the information from Constant Contact at all in the past. *Id.* There was no reasonable WLJ business purpose for obtaining an export of the data when the company particularly kept it secure within Constant Contact. *Id.* And Ipsen's request came only 13 days before his resignation. *Id.*

WLJ thus investigated the events surrounding Ipsen's departure and found he had been building a competing business (Stock Point) for months. *Id.*, ¶ 18. The investigation revealed that the following occurred while Ipsen was still employed with WLJ:

- On March 6, 2026, he formed Stock Point under the laws of Idaho. *Id.*, ¶ 18, Ex. B. The Certificate of Organization lists Ipsen's wife, Stevie Ipsen, as its registered agent, with the principal office at the Ipsens' residence (4550 Elgin Road, New Plymouth, Idaho 83655). *Id.* Ipsen and his wife are listed as governors. *Id.;*

- On April 19-20, 2026, after the in-person strategy meeting, the domain "stockpointmedia.com" was registered through Squarespace Domains LLC. *Id.*, ¶ 19. Within minutes of registration, nameservers were pointed to Google Cloud DNS/Firebase, indicating immediate technical infrastructure buildout. *Id.*; Lovett Decl., ¶ 6, Ex. A;

- On May 23, 2026, the first market report was published on stockpointmedia.com (the "Stock Point Website"). Hughes Decl., ¶ 20;

- On June 3, 2026, Ipsen accessed SimpleCirc and exported data at least six times. *Id.*, ¶ 21; Jackson Decl., ¶ 3, Ex. A (showing six instances exporting data, after having not accessed SimpleCirc for 18 months);

- On June 11, 2026, the first calendar/event listing (Donati Ranch) was added to the Stock Point Website. *Id.*, ¶ 22;

- On June 16, 2026, Ipsen requested and received the Email List. *Id.*, ¶ 23; Oldcorn Decl., ¶¶ 2-6, Ex. A, Ex. B;

- On June 17, 2026, Ipsen had a call with Brincefield and Miller Fortozo, during which he communicated frustration with the turnaround plans Superior was requiring him to implement. Brincefield Decl., ¶ 9. He told Brincefield and Miller Fortozo that Superior had a personal vendetta against him, which was the reason for coming operational changes. *Id.* After saying this, he indicated that he was developing a side project that seemed to involve quitting and taking the sales staff with him. *Id.* Specifically, he said: "I don't have any intention of just bailing. But I'm not afraid to go start my own thing when I'm out. And that's where I stand. I have a pretty neat project . . . in the works, just in case. But I just feel like I've got to give this my best effort . . . trying to navigate this and figure it out, or figure out where I can keep the salespeople together under a different name." *Id.* When Brincefield confronted him about his "Plan B" that would leave WLJ to "pick up the pieces" after he left, Ipsen responded that he wasn't "just trying to leave and you guys pick up the pieces. It's me leaving so that the pieces stay together." *Id.* During the call, Ipsen also indicated that he had shared with Patterson the content of confidential communications about the planned reassignment of Patterson's sales

accounts and refused to terminate him. *Id.*, ¶ 10. The same day, the second market report was published on the Stock Point Website. Hughes Decl., ¶ 24;

- On June 25, 2026, another calendar listing was added to the Stock Point Website. *Id.*, ¶ 25;

- On June 26, 2026, stockpointmedia.com published ten news articles within a two-hour window. *Id.*, ¶ 26. The same day, the Stock Point Facebook page launched, its first post published at 3:00 p.m. *Id.*; Soares Decl., Ex. A. And Ipsen met via Zoom with the three WLJ salesmen and asked them to join his new venture. Hughes Decl., ¶ 27; Brincefield Decl., ¶ 11, Ex. A; and

- On June 27, 2026, an additional calendar listing and first sales report were published on stockpointmedia.com. Hughes Decl., ¶ 28.

And within 71 minutes of Ipsen's resignation from WLJ on June 29, 2026, the Stock Point Website published four more news articles. *Id.*, ¶ 29. Over the following two days, the website published six more articles and continues publishing generally on a daily basis. *Id.*

Examination of the Stock Point Website shows reliance on the Strategic Plan. *Id.*, ¶ 30; Lovett Decl., ¶¶ 7-11, Exs. B-H. For instance, the filters, user experience design, seedstock producer-based model, and proprietary interactive map all evidence Ipsen's imitation of the Strategic Plan, which he only obtained because he was directed to implement it on behalf of WLJ. Hughes Decl., ¶ 30; *see also* Lovett Decl., ¶¶ 7-11, Exs. B-H.

**H.      WLJ Demands Defendants Cease and Desist—Without Result.**

On July 6, 2026, WLJ, through counsel, sent a cease-and-desist letter to Ipsen, Stevie Ipsen, and Stock Point. Hughes Decl., ¶ 34, Ex. C. The letter demanded Defendants stop using and immediately return the Subscriber List and Strategic Plan. *Id.* WLJ received no response. *Id.* The Stock Point Website continues to publish, using the Strategic Plan. Hughes Decl., ¶ 29. Thereafter, WLJ worked diligently with counsel to prepare this legal action. *Id.*, ¶¶ 35-38.

III.     LEGAL STANDARD

This Court has discretion to temporarily restrain and preliminarily enjoin parties. *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001). The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

While the substantive standard for the two forms of emergency relief is the same, a temporary restraining order preserves the status quo pending a decision whether a preliminary injunction should issue. *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008-09 (D. Or. 2019). And a preliminary injunction "preserve[s] the *status quo* pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988) (citation omitted). *Status quo* means "the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).

A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: "(1) [it] is likely to succeed on the merits of [its] claim, (2) [it] is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [its] favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

"The elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Thus, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 859 (9th Cir. 2022) (similar).

To prevail on its motion for temporary restraining order or preliminary injunction, a plaintiff need only meet the test as to one of its claims. *NRA of AM. v. City of L.A.*, 441 F. Supp. 3d 915, 928 (C.D. Cal. 2019).

## IV.  ARGUMENT

All four elements weigh heavily in favor of injunctive relief.

**A.     <u>Element One: WLJ Is Likely to Succeed on the Merits of Its Claims</u>.**

### 1.  WLJ is likely to prove its federal and state trade secret claims.

This Court may analyze the first two elements of the Defend Trade Secrets Act ("DTSA") and Oklahoma Uniform Trade Secrets Act claims together because they "align." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1089 (10th Cir. 2025) (explaining that the elements of (1) existence of a trade secret and (2) misappropriation are coextensive). An Oklahoma trade secret claim, however, requires a plaintiff to additionally show "use of the trade secret to [a plaintiff's] detriment." *Id.* And a DTSA claim requires a plaintiff to prove the trade secrets were "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Here, WLJ's trade secrets satisfy the interstate commerce requirement: WLJ serves customers across the western United States, the Subscriber List and Email List contain contact information from multiple states, and Stock Point operates a website accessible nationwide. Hughes Decl., ¶¶ 3, 14-15.

**a.     WLJ is likely to establish the Subscriber List, Email List, and the Strategic Plan are trade secrets.**

**i.     The Subscriber List and Email List are trade secrets.**

A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts

that are reasonable under the circumstances to maintain its secrecy." 78 Okla. Stat. § 86(4); 18 U.S.C. § 1839(3) (similarly defining trade secret).

To determine whether information constitutes a trade secret, courts consider the following factors: "(1) the extent to which the information is known outside the plaintiff's business"; (2) "the extent to which it is known by employees and others involved in the business"; (3) "the extent of measures taken by the business to guard the secrecy of the information"; (4) "the value of the information to the business and its competitors"; (5) "the amount of effort or money expended by [the business] in developing the information"; and (6) "the ease or difficulty with which the information could be properly acquired or duplicated by others." *Amoco Prod. Co. v. Lindley*, 609 P.2d 733, 743 (Okla. 1980).

Confidentially held customer information constitutes a trade secret. *See, e.g.*, *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520-22 (9th Cir. 1993) (affirming grant of summary judgment establishing former employee's liability for misappropriation of confidential customer database information); *Bigrentz, Inc.*, 2023 U.S. Dist. LEXIS 204818, at *5 ("Ordinarily, a customer list is a trade secret if it is not generally known to or readily ascertainable to others and if it is subject to reasonable efforts to maintain its secrecy.").

WLJ will likely prove the Subscriber List and Email List constitute trade secrets. Both are compilations of confidential customer information maintained in secured accounts permitting access only to a few WLJ employees with a business need. *See supra*, Part II.D. The lists required years to build through personal relationships, cannot be independently compiled from public sources, and bear (at least) a six-figure value reflected in the 2021 WLJ purchase price. *See id.*

The Subscriber List and Email List derive independent economic value from their confidential nature. *See id.* They form the foundation for the company's ability to generate new

business and obtain repeat business from former clients. *Id.* The lists must be safeguarded from competitors because, for example, a competitor could use the Subscriber List to reach out to individuals the competitor otherwise would not know to contact or how to contact. Hughes Decl., ¶ 15. A competitor could use the Subscriber List or Email List to disrupt WLJ's client relationships, for instance, by demonstrating individualized knowledge about the client relying on confidential notes. *Id.* In the hands of a competitor, the Subscriber List or Email List could be used as an inside track to cut WLJ out of sales and opportunities, without the competitor ever having to invest in the resources it took to build the lists. *Id.*

The Subscriber List and Email List are subject to reasonable secrecy measures, using secured platforms for data storage and limiting login credentials to only a few WLJ employees who need to use the information to perform their job duties. *See supra*, Part II.D.

### ii. The Strategic Plan is a trade secret.

The Strategic Plan is the result of months of financial and performance analysis by C-suite level management, as well as research and development of a new web-based platform. *See supra* Part II.E. Management was careful to keep the Strategic Plan confidential, only sharing it with Ipsen so that he could implement it as President of WLJ. *Id.* It derives independent economic value from its confidentiality; sharing it with a competitor would give the competitor the automatic leg up on putting together a higher efficiency business model without the investment of time and expertise and access to proprietary customer data. Hughes Decl., ¶ 10. In other words, in the hands of a competitor like Stock Point, the Strategic Plan provides an unfair competitive advantage. *Id.*

### b. WLJ is likely to prove Defendants misappropriated the Subscriber List, Email List and Strategic Plan.

Misappropriation means "Disclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know

that his knowledge of the trade secret was: . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or . . . [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]" 78 Okla. Stat. § 86(2)(b)(2)(b)-(c); 18 U.S.C. § 1839(5) (similarly defining misappropriation).

In this case, Ipsen obtained the Email List and Subscriber List during his employment with WLJ. He did not have credentials to access the Email List and only obtained it on pretext created by his title. Ipsen's request to Oldcorn demonstrates he knew or should have known that the Email List was maintained as a trade secret and that he had a duty to maintain its secrecy or limit its use to the scope of his duties as president of WLJ. Likewise, the security measures for SimpleCirc show Ipsen's knowledge of the Subscriber List's trade secret nature. He had no legal right to take the lists with him post-resignation. Nor did he have the right to use the lists for the benefit of a business in competition with WLJ. When the lists were demanded back in the cease-and-desist letter, Ipsen refused, indicating his and Stock Point's intent to continue using them. Moreover, the Stock Point Website claims "21,000 readers" and "50,000 potential digital footprint," Lovett Decl., Ex. G, which only seems possible using the Subscriber List and Email List.

Likewise, Ipsen obtained the Strategic Plan only because he was needed to implement it as the president of WLJ. He knew or had reason to know that he had a duty to maintain its secrecy because only executive management was permitted access. His immediate use of the Strategic Plan for Stock Point shows he understands the competitive value. *See* Lovett Decl., ¶¶ 7-11, Exs. B-H.

Moreover, the Defendants' timeline revealed in WLJ's investigation after Ipsen resigned demonstrates misappropriation in this case. *See supra*, Part II.G. Ipsen set up Stock Point but did not leave WLJ until after he had gained information and advantage he could use for Stock Point. *Id.* Ipsen waited for WLJ to complete its round of strategic planning and identified action items

capable of imitation by a competitor. *Id.* Despite repeated follow-up, he refused to carry out the Strategic Plan, delaying WLJ's ability to strengthen its financial position. *See id.* He also delayed his own resignation, collecting full salary, until he had stolen valuable customer information on which he could build Stock Point's business. *See id.*

### c. WLJ is likely to prove detriment.

A plaintiff may prove detriment if the misappropriation provided defendant an unfair competitive advantage. *See MTG Guarnieri Mfg. v. Clouatre*, 239 P.3d 202, 214 (Okla. Ct. App. 2010) (vacating summary judgment dismissal of trade secret claim where plaintiff had introduced evidence that defendant had obtained an unfair competitive advantage by misappropriating certain manufacturing processes of the plaintiff).

The nature of the information Ipsen took, and Defendants wrongfully retain, demonstrates unfair competitive advantage to satisfy this element. In the hands of a competitor like Stock Point, the Subscriber List and Email List can be used to cut WLJ out of sales and opportunities, without Stock Point ever having to invest in the resources it took to build the lists. *Id.* Likewise, the Strategic Plan, implemented on behalf of a competitor like Stock Point, wrongfully applies the highly confidential strategies built by WLJ to create a streamlined, competing platform and business model. The Seed-Stocked website was unique until Ipsen stole the Strategic Plan and built out the Stock Point Website to mimic it. Plaintiffs now are wrongfully forced to race Stock Point to gain market share in this space, where their only competitor to build the purebred seedstock directory model was only able to become a competitor through theft of trade secret information.

### 2. WLJ is likely to succeed on misappropriation of business information.

"Oklahoma recognizes the common-law tort of misappropriation of confidential business information," whereby a defendant "[1] for the purpose of advancing a rival business interest, [2] procures by improper means [3] information about [an]other's business[.]" *Double Eagle Alloys,*

*Inc.*, 134 F.4th at 1098. Regarding the second element, liability arises from the defendant's wrongful "possession, disclosure or use of the information." *Id.*; *Video Game Techs., Inc. v. Castle Hill Studios, LLC*, 2018 U.S. Dist. LEXIS 861, at *16 (N.D. Okla. Jan. 3, 2018) (both former employee's unauthorized retention of information and disclosure to competitor would satisfy the second element of misappropriation of confidential business information). As to the third element, the misappropriated information must be confidential—but at some level of sensitivity less than a trade secret. *Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 827 (Okla. 2016).

In the alternative to its trade secret claims, WLJ has pleaded claims for misappropriation of business information. In the event the Subscriber List, Email List, or Strategic Plan do not rise to the level of trade secrets, they are unquestionably confidential business information, and WLJ is likely to succeed on its misappropriation of business information claims.

### 3. WLJ is likely to succeed on its breach of fiduciary duty claims.

To prevail on a breach of fiduciary duty claim, a plaintiff must show (1) the existence of a fiduciary duty; (2) defendant's breach of the duty; and (3) that the breach was the direct cause of damages to plaintiff. *Graves v. Johnson*, 359 P.3d 1151, 1155 (Okla. Ct. App. 2015).

A fiduciary duty exists here. A manager of a limited liability company organized under the laws of Oklahoma owes fiduciary duties of good faith and loyalty to the company. *Hamlin v. Yob*, 588 P.3d 941 (Okla. Ct. App. 2026) (rejecting COO's argument he owed no fiduciary duty to the limited liability company and affirming finding of breach against him); 18 Okla. Stat. § 2016 ("A manager shall discharge the duties as a manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner the manager reasonably believes to be in the best interests of the limited liability company[.]").

Even apart from statutorily created fiduciary duties, a fiduciary relation may arise "where influence has been acquired and abused and where confidence has been reposed and betrayed."

*Roberson v. PaineWebber, Inc.*, 998 P.2d 193, 198 (Okla. Ct. App. 1999) (remanding for factual determination whether fiduciary duty arose from course of dealings between the parties).

As president of WLJ, Ipsen owed fiduciary duties to WLJ. *Hamlin*, 588 P.3d at 941; 18 Okla. Stat. § 2016. WLJ is likely to prove that Ipsen breached his fiduciary duties. As described above, Ipsen wrongfully retained trade secret and/or confidential business information for use on behalf of a competitor business in violation of his duty of loyalty.

**B.** <u>**Element Two: An Injunction Is Necessary to Prevent Irreparable Harm**</u>.

A movant must demonstrate that immediate, irreparable injury is likely in the absence of an injunction. *Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1220 (D. Idaho 2013). Harm is irreparable if it cannot be undone by an award of compensatory damages. *Colo. River Indian Tribes v. Parker*, 776 F.2d 846, 850 (9th Cir. 1985); *see also Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("[I]rreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.").

### 4. The refusal to return—and use of—the Subscriber List, the Email List, and the Strategic Plan give rise to imminent, irreparable harm.

"The threat of loss of prospective customers, goodwill, or reputation may support a finding of irreparable harm, so long as it is not too speculative." *Battelle Energy All., LLC*, 980 F. Supp. 2d at 1220; *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 (affirming district court order because absent a preliminary injunction plaintiff faced threat of losing prospective customers, accompanying goodwill, and revenue); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (affirming preliminary injunction prohibiting defendant from opening new store in likely violation of noncompete covenants, to protect plaintiff's goodwill).

Demonstrating irreparable harm due to unlawful competition, in *Brinton Business Ventures, Inc. v. Searle*, the court granted a preliminary injunction when plaintiff presented evidence that

defendant was servicing at least two of plaintiff's former customers and had solicited at least ten additional customers. 248 F. Supp. 3d 1029, 1039 (D. Or. 2017).

"Irreparable harm may arise when a company loses prospective goodwill due to the lost ability to market a unique product." *Battelle Energy All., LLC*, 980 F. Supp. 2d at 1221; *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).

A "defendant's ability to gain a competitive advantage through the use of confidential information to develop a competing product is sufficient to constitute irreparable harm." *Solarpark Korea Co., Ltd. v. Solaria Corp.*, No. 23-cv-01181-AMO, 2023 U.S. Dist. LEXIS 134650, at *24-25 (N.D. Cal. Aug. 2, 2023) (granting preliminary injunction); *E.W. Bank v. Shanker*, No. 20-cv-07364-WHO, 2021 U.S. Dist. LEXIS 137077, at *40 (N.D. Cal. July 22, 2021) (holding likelihood of irreparable harm established because plaintiff would likely suffer loss of market position, loss of current and prospective customers, and increased risk of further disclosure of its confidential information to third parties").

"An intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aero. & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (granting preliminary injunction); *DejaVuAI Inc. v. Kapustin*, No. 2:25-cv-00915-JNW, 2025 U.S. Dist. LEXIS 182671, at *24 (W.D. Wash. Sept. 17, 2025) (holding irreparable harm established through evidence that defendant had "threatened to destroy, publish, and sell [plaintiff's] trade secrets").

The evidence demonstrates Defendants' intention to continue using WLJ's trade secrets. Stock Point's website is built on the Strategic Plan and continues to publish frequently. Hughes Decl., ¶¶ 29-30. Despite receiving WLJ's cease-and-desist letter demanding return of the misappropriated information, Defendants refused to respond and have not returned any materials.

*Id.*, ¶ 34. The Stock Point Website claims "21,000 readers" and a "50,000 potential digital footprint," Lovett Decl., Ex. G, suggesting use of WLJ's customer lists. The harm to WLJ from this continued misappropriation—loss of customer relationships, competitive positioning, and goodwill—cannot be adequately compensated by money damages because such losses are inherently difficult to quantify. Hughes Decl., ¶ 33.

**C.**      **Element Three: The Balance of Equities Tips in WLJ's Favor.**

When the harm to plaintiff is permanent or difficult to quantify, the balance of hardships tips in its favor. *See Rent-A-Center, Inc*., 944 F.2d at 603 (holding balance of equities weighed in plaintiff's favor where, without an injunction, plaintiff faced losses difficult to quantify); *see also Geo. Wash. Mint, Inc. v. Wash. Mint, Inc.*, 349 F. Supp. 255, 263 (S.D.N.Y. 1972) (holding balance of equities in plaintiff's favor when defendant's new business relied on allegedly infringing trademark and reasoning that a preliminary injunction could even be viewed as a "kindness" because it would stop the potentially doomed business early).

The balance of equities tips in WLJ's favor. WLJ's injury is at best difficult to quantify. Stock Point's integration of WLJ's Strategic Plan and improper retention and use of the Subscriber List create complex questions of how to measure the damage to WLJ's goodwill and customer relationships. Hughes Decl., ¶ 33. The Stock Point Website has only just been launched, and like the defendant in *Geo. Washington Mint*, the business has just begun; enjoining its likely illegally positioned business would not be prejudicial.

**D.**      **Element Four: The Public Interest Weighs in Favor of Injunctive Relief.**

The public interest favors protection of confidential information and enforcement of fiduciary duties. "The public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights." *Compass Bank v. Hartley*, 430 F. Supp.

2d 973, 983 (D. Ariz. 2006). Here, a temporary restraining order and preliminary injunction would only serve to enforce WLJ's clear legal rights, weighing in favor of injunctive relief.

### E.      <u>**Bond Requirement**</u>

Federal Rule of Civil Procedure 65(c) permits a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court has "wide discretion" in setting the bond amount. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). This discretion includes the decision to require no bond. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000) (affirming district court decision to not order a bond).

Courts may dispense with a bond where, as here, the injunction merely requires the defendant to comply with existing legal obligations. *See UFW v. Noem*, 785 F. Supp. 3d 672, 742 (E.D. Cal. 2025) (affirming decision not to order a bond because defendant was essentially being ordered to comply with constitutional and statutory duties).

Here, Defendants, if ordered to stop misappropriating trade secrets and return confidential information, suffer no cognizable harm from compliance. They had not right to use or retain the information in the first place. Moreover, Stock Point's business has only been operational for a matter of weeks, and any temporary restraint on its operations would cause minimal disruption compared to the continuing irreparable harm to WLJ from Defendants' ongoing misappropriation. Accordingly, the Court should require only a nominal bond or waive the bond requirement entirely.

**V.     CONCLUSION**

WLJ respectfully requests that this Court enter a temporary restraining order and preliminary injunction: (a) enjoining Defendants from using, disclosing, or retaining the Subscriber List, Email List, Strategic Plan, or any other trade secrets or confidential business information of WLJ; (b) requiring Defendants to immediately return to WLJ all documents, data, and materials containing or derived from WLJ's trade secrets or confidential business information; (c) enjoining Defendants from soliciting, contacting, or doing business with any customers, subscribers, or advertisers of WLJ using information obtained from the Subscriber List or Email List; (d) enjoining Defendants from operating Stock Point, or any similar competing business using WLJ's Strategic Plan or any derivative thereof; and (e) granting such other and further relief as this Court deems just and equitable.

DATED:  August 5, 2026

HOLLAND & HART LLP


By: */s/Erik F. Stidham*
<u></u>
Erik F. Stidham
Jennifer M. Aiko
Attorneys for Plaintiffs