Erik F. Stidham (ISB #5483)
Jennifer M. Aiko (ISB #9275)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone:  208.342.5000
EFStidham@hollandhart.com
JMAiko@hollandhart.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN LIVESTOCK JOURNAL, LLC, an Oklahoma limited liability company and SUPERIOR LIVESTOCK AUCTION, LLC an Oklahoma limited liability company,<br><br>      Plaintiffs,<br><br>vs.<br><br>LOGAN M. IPSEN, an individual and STOCK POINT MEDIA GROUP, LLC, an Idaho limited liability company,<br><br>      Defendants. | Case No.   1:26-cv-00500-REP<br><br>**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Sam Hughes, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am the Chief Operating Officer ("COO") of Superior Livestock Auction, LLC ("Superior"). I make this declaration based on my personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      As COO of Superior, I am responsible for overseeing the operations of Superior and its subsidiaries, including Western Livestock Journal, LLC ("WLJ"). My responsibilities include strategic planning, executive management, oversight of subsidiary operations, and

**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 1**

business development for the Superior family of companies. I have served as COO of Superior since January 1, 2022.

**The Western Livestock Journal**

3. The Western Livestock Journal is a 100-year-old legacy brand, a livestock industry publication serving seedstock producers, auction markets, ranchers, and agricultural businesses across the western United States. Its offerings include news coverage of the western livestock industry, market reports, sale calendars (bull sales, production sales), and advertising services to a targeted audience in the livestock sector. Advertising typically includes "ring service," providing in-person auction calling at the advertised sale.

4. WLJ was organized for the purchase of the journal and the management of its business on December 21, 2021. WLJ was formed under the laws of Oklahoma. It is a wholly owned subsidiary of Superior.

**Logan Ipsen Hired**

5. In 2022, WLJ hired Logan M. Ipsen ("Logan") to serve as President of the company. Logan was responsible for supervising WLJ operations, developing and improving company strategy, monitoring gross and net margins, and reviewing and approving budgets.

6. On or about July 21, 2022, Logan acknowledged in writing WLJ's employee handbook. Among other things, the employee handbook imposes strict non-disclosure obligations on employees with respect to customer information and business operation information. Attached hereto as **Exhibit A** is a true and correct copy of Logan's acknowledgement of WLJ's employee handbook.

**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** - 2

## WLJ's Strategic Plan

7. After a few years under Logan's management, WLJ's financial position was not as favorable as Superior and WLJ had hoped it would be. WLJ had continued and sustained financial losses with no improvement or plan for improvement communicated to Superior's executives. Every time the Superior executives met with Logan, we felt his core objective was to buy time for an additional year or two. In 2026, the Superior executive team determined WLJ needed a new strategic plan to improve its performance.

8. To this end, on April 19, 2026, WLJ held an in-person strategy meeting in Oklahoma City. Meeting attendees included Logan, Danny Jones (Superior President), Mason Groves (Chief Operating Officer for Superior's parent company), and myself. This was a closed-door meeting in Danny's office, confidential because we were discussing strategic planning. We discussed WLJ's financials and the confidential action items expected to improve the company's position, including (1) a reduced-frequency print publication model, (2) discontinuing WLJ renting its own space, and (3) certain workforce reductions (the "Action Items"). Logan, who had been an independent contractor salesman for WLJ before his role as President, was to assume the book of business of Jared Patterson, whose sales contract would be terminated. This book of business was formerly Logan's when he was a salesman. While it is never easy to lay off a worker, WLJ's continuing losses required difficult measures. Logan's compensation (fully salaried) would shift to a part salary/part commission basis. Based on his prior sales record, he would be able to make more total compensation under the new arrangement.

9. Directly after this meeting, at my directive, Logan sat down with Dare Lovett to discuss strategic planning initiatives I had developed with Dare and executive management. These initiatives included the Seed-Stocked business plan, a digital marketing integration strategy for

**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 3**

advertisers, news aggregation model similar to "Morning Brew," proprietary map features and digital tools, and the path to incorporating the Seed-Stocked strategy under the WLJ umbrella (together with the Action Items, the "Strategic Plan").

10. The Strategic Plan was the result of months of financial and performance analysis by C-suite level management. We analyzed cost structures and certain products and areas with compressed gross margins, evaluating consumer preferences and trends. We were careful to keep the Strategic Plan confidential. To protect its confidentiality, the Strategic Plan was only shared with a few individuals in executive management and Dare Lovett, on a need-to-know basis. We shared the Strategic Plan with Logan so that he could implement it as President or Manager of WLJ. Sharing it with a competitor would be catastrophic, giving the competitor an automatic leg up on putting together a higher efficiency business model without the investment of time and expertise and access to proprietary customer data. In other words, in the hands of a competitor, the Strategic Plan provides an unfair advantage.

11. After the April 19, 2026 strategy meeting, I continued to meet and communicate with Logan to implement the Strategic Plan. Logan only completed one task to further the Strategic Plan. He was required to (and did) provide me with a list of employees and duties in order to further evaluate operational efficiencies. He was required to terminate Jared Patterson's contract. But instead of doing so, I later learned that he shared that Jared's contract would be terminated and tried to recruit Jared to join Stock Point. Otherwise, he made no progress toward implementing the Strategic Plan. He took no action that would indicate he intended to ever implement the Strategic Plan.

**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 4**

12.     On May 15, 2026, Logan was reappointed "Manager" of WLJ at the annual meeting of the board of directors, held at the Embassy Suites Hotel in Oklahoma City, Oklahoma. I attended that meeting.

**WLJ's Subscriber List and Email List**

13.     The Subscriber List is a compilation of confidential information on clients maintained within WLJ's secured SimpleCirc account, which took years of work and expertise to generate. It contains past and present print subscriber names, addresses, and in some cases phone numbers, email addresses, and/or other notes about the customer. Only three WLJ employees have access to the SimpleCirc account, each with their own unique username and password.

14.     WLJ also maintains an account with Constant Contact, in which email subscribers' confidential information is stored (the "Email List"). The Constant Contact account is secured with username, password, and two-factor authentication. Access is limited only to individuals who need to send or manage email newsletters or e-blasts to the individuals who have opted into such communications from WLJ.

15.     A competitor's use of WLJ's Subscriber List or Email List is especially harmful. The Subscriber List and Client List form the foundation for the company's ability to generate new business and obtain repeat business from former clients. The customer lists were an element of the intangible property obtained in the purchase of WLJ in 2021, the lists themselves valued at six figures. Each name and corresponding note exists because an individual specifically invested time promoting WLJ, building rapport with the client, and learning about the client's needs and business. Confidentiality is crucial. A competitor could use the Subscriber List or Email List to reach out to individuals the competitor otherwise would not know to contact or how to contact. A competitor could use the Subscriber List or Email List to disrupt WLJ's client relationships, for

**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 5**

instance, by demonstrating individualized knowledge about the client relying on confidential notes. In the hands of a competitor, the Subscriber List or Email List can be used as an inside track to cut WLJ out of sales and opportunities, without the competitor ever having to invest in the resources it took to build the Subscriber List or Client List.

16. Additionally, a competitor's unfair advantage from the lists erodes the subscriber base for the salespeople's sale of advertising, lowering the value of such ads. WLJ's salespeople are paid 100% on commission. Loss of customers from unfair competition will directly impact WLJ's ability to keep its sales talent. And if losses go unmitigated (the Subscriber List and Client List are not returned), there is imminent risk of a downward spiral—the loss of salespeople due to unfairly depressed sales revenue turning into further lost revenue for WLJ due to departing salespeople. Salespeople are difficult to find because of the specialized experience required for their success—in advertising, the cattle industry, and auction. Loss of even one salesperson could be catastrophic to WLJ's annual revenue.

**Logan Resigns**

17. On June 29, 2026, Logan resigned from WLJ. WLJ had not expected Logan to leave at that time, right after the company had completed months of closed-door strategic planning and was at the vulnerable point of implementing it. Moreover, Logan's obtaining the export of the Subscriber List seemed suspicious because Logan had apparently not used the information in SimpleCirc at all in the past. There was no reasonable WLJ business purpose for obtaining an export of the data when the company particularly kept it secure within SimpleCirc. And Logan's request came only 13 days before his resignation.

18. WLJ thus investigated the events surrounding Logan's departure and found he had been building a competing business for months—Stock Point Media Group, LLC ("Stock Point").

On March 6, 2026, he formed Stock Point under the laws of Idaho. The Certificate of Organization lists Logan's wife, Stevie A. Ipsen ("Stevie Ipsen"), as its registered agent, with the principal office at the Ipsens' residence (4550 Elgin Road, New Plymouth, Idaho 83655). Logan and Stevie Ipsen are listed as governors. Attached as **Exhibit B** is true and correct copy of the Certificate of Organization for Stock Point dated March 6, 2026.

19.	On April 19-20, 2026, after the in-person strategy meeting, the domain "stockpointmedia.com" was registered through Squarespace Domains LLC. Within minutes of registration, nameservers were pointed to Google Cloud DNS/Firebase, indicating immediate technical infrastructure buildout.

20.	On May 23, 2026, the first market report was published on stockpointmedia.com (the "Stock Point Website").

21.	On June 3, 2026, I understand that Logan exported data from SimpleCirc at least six times.

22.	On June 11, 2026, the first calendar/event listing (Donati Ranch) was added to the Stock Point Website.

23.	On June 16, 2026, I understand that Logan requested and received an export of the Email List.

24.	On June 17, 2026, the second market report was published on the Stock Point Website.

25.	On June 25, 2026, an additional calendar listing was added to the Stock Point Website.

26. On June 26, 2026, stockpointmedia.com published ten news articles within a two-hour window. The same day, the Stock Point Media Facebook page was created, with its first post published at 3:00 p.m. that day.

27. The same day, I understand that Logan met via Zoom with the three WLJ salesmen and asked them to join his new venture.

28. On June 27, 2026, an additional calendar listing and first sales report were published on stockpointmedia.com.

29. And within 71 minutes of Logan's resignation from Western Livestock on June 29, 2026, the Stock Point Website published four more news articles. Over the following two days, the website published six more articles and continues publishing generally on a daily basis.

30. Examination of the Stock Point Website shows reliance on the Strategic Plan. For instance, the filters, user experience design, seed-stock producer-based model, and proprietary interactive map all evidence Logan's imitation of the Strategic Plan, which he only obtained because he was directed to implement it on behalf of WLJ. I would never have shared the Strategic Plan with him or directed Dare to share the technological initiatives with him, had I known that he was building out his own, competing business using WLJ's confidential and proprietary information he had obtained under pretense and while employed with WLJ.

31. Among other things, the Defendants' timeline demonstrates misappropriation in this case. Defendants set up Stock Point, but Logan did not resign from WLJ until after he had gained information and advantage he could use for Stock Point.

32. Logan waited for WLJ to complete its round of strategic planning and identified action items capable of imitation by a competitor. He withheld approvals for WLJ's actions in implementing the strategic plan, to delay WLJ's ability to strengthen its financial position. Logan

has wrongfully retained the Subscriber List and Email List after his tenure with WLJ ended. And within days of Logan resigning, Stock Point hard launched its website and rolled out over a dozen posts.

33.     Stock Point's integration of WLJ's Strategic Plan and improper retention and use of the Subscriber List create complex questions of how to measure the damage to WLJ's goodwill and customer relationships.

## Legal Action

34.     On July 6, WLJ, through counsel, sent a cease-and-desist letter to Logan, Stevie Ipsen, and Stock Point. Attached hereto as **Exhibit C** is a true and correct copy of the letter. WLJ received no response.

35.     After receiving no response to the cease-and-desist letter, WLJ and Superior have moved diligently to protect their interests, investigate the actions taken by Logan, and pursue enforcement of their legal rights. WLJ and Superior investigated and retained a law firm in Idaho to advise them on potential legal actions. By July 15, 2026, WLJ and Superior had retained the Holland & Hart law firm to advise them on potential claims against Ipsen and Stock Point.

36.     Once legal counsel indicated it had performed sufficient investigation and research to advise WLJ and Superior of their legal rights, counsel was directed to diligently prepare a complaint and seek injunctive relief.

37.     Since that time, WLJ and Superior have worked with legal counsel to prepare the complaint, required motions, and supporting declarations as expeditiously as possible.

38.     The trade secret and confidential business information that we believe Ipsen misappropriated is extremely valuable to WLJ and, in turn, Superior. The trade secrets and

confidential business information were kept confidential within those organizations and are protected through the use of reasonable safeguards.

39.     I have reviewed the Complaint filed in this action and the factual allegations contained therein. Based on my personal knowledge and my review of WLJ's and Superior's records, the factual allegations in the Complaint are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  August 4, 2026

By: _____
        Sam Hughes
        Chief Operating Officer
        Superior Livestock Auction, LLC

38726098_v3

**DECLARATION OF SAM HUGHES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION - 10**